X-L SERVICE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
X-L Service, Inc. v. Commissioner
Docket No. 6850-70.
United States Tax Court
T.C. Memo 1973-148; 1973 Tax Ct. Memo LEXIS 139; 32 T.C.M. (CCH) 701; T.C.M. (RIA) 73148; July 3, 1973, Filed *139 Lewis R. Donelson and Boyd L. Rhodes, Jr., for the petitioner. Vallie C. Brooks, for the respondent. Dawson
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $16,822.93 in petitioner's Federal income tax for the year 1967. 2 At issue is the proper treatment of payments totaling $35,051.25 received in 1967 by petitioner's president and sole shareholder from the Hamilton Oil Company. We must decide, first, whether the payments represent rebates or discounts on gasoline purchases which reduced petitioner's cost of goods sold, and are thus includable in petitioner's gross income. If the amounts are includable in the gross income of petitioner, then we must decide whether petitioner is entitled to a deduction for additional compensation paid to its president and sole shareholder and, if so, whether all or part of it constitutes reasonable compensation for services rendered. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. X-L Service, Inc. (herein called petitioner) was incorporated under the laws of the State of Tennessee on February 1, 1953. Its principal place *140 of business is in Collierville, Tennessee, and was located there when it filed its petition in this proceeding. Petitioner's Federal corporate income tax return for 1967 was filed with the district director of internal revenue at Nashville, Tennessee. Petitioner, a retail distributor of oil products, computes its taxable income on the accrual method of accounting. 3 From its incorporation in 1953 through 1967, all of petitioner's outstanding stock was owned by Jack T. Billings (sometimes referred to herein as Billings). He is the president and dominant officer of petitioner. During the years 1964 through 1967 the petitioner had common stock outstanding in the amount of $30,000. Petitioner operates 10 retail gasoline stations which sell gasoline at a price averaging two cents per gallon less than the major oil companies charge at their retail outlets. Petitioner will accept any major credit card. In order to protect petitioner from the vicissitudes of the retail gasoline market, Billings has taken steps to diversify its geographic and its product market. Petitioner has retail outlets located in Memphis and in other communities. [1] Petitioner has also added drive-in *141 grocery stores and coin-operated laundries to some of its service stations. The primary requisite for success in this market is the location of the service station. Other important factors include an assured source of supply, a stable price and competent station management. Billings handled the full range of duties with respect to choosing a station's location, designing of facilities, arranging gasoline purchases, setting prices and hiring managers for the individual establishment. The station managers handled the day-to-day transactions. 4 Billings has been purchasing gasoline for his own account since at least 1953. After leaving his employment with Southern Petroleum Company to go on his own, Billings purchased his gasoline needs from Southern. When offered a better price by D-X Sunray, he moved his account there. Some time in the mid-1950's, B. B. Hamilton, a former associate of Billings during his tenure with Southern Petroleum Company, invited Billings and several other *142 independent station owners to a meeting. Hamilton told them of plans to form the Hamilton Oil Company. To do so he needed additional buying power to obtain the low prices offered volume purchasers by refiners. Hamilton proposed that the independents obtain their petroleum needs from him. In consideration of such a pooling arrangement he offered to rebate to them the difference between his volume cost and the "dock" cost to other purchasers. The members of the pool would buy from him at the price he charged nonmembers; however, monthly rebates to the members would be paid representing the volume saving. Hamilton would add only his costs less profit to the price paid by the members. This price was less than the price they could obtain on their own. On its books Hamilton Oil Company treated the price adjustments made to the pool as a debit to sales and a credit to the account of 5 the pool member. To three of the members Hamilton Oil Company issued credit memoranda with a credit to accounts receivable. To two other members it issued a check for the price adjustment and credited accounts payable. The rebate amount differed depending on the quality and quantity of gasoline *143 purchased. During 1967 Hamilton Oil Company paid rebates to the pool members totaling $162,208.65. The payments ranged from $2,534.81 to $89,056.85, with petitioner being credited with $37,564.19. During 1967 the petitioner paid the so-called "dock" or market price. The price adjustments were made by Hamilton Oil Company in the form of a monthly check mailed to Billings. The total amount of $35,051.25 [2] was reported on Billings' joint Federal income tax return as "Fees Hamilton Oil Company." The only reference in petitioner's books and records for 1967 of these sums is found in the minutes of a meeting of the board of directors dated December 29, 1967. The minutes read, in pertinent part, as follows: A special meeting of the Board of Directors of X-L Service, Inc. was held at the offices of the corporation, Collierville, Tennessee, at 10:00 o'clock A.M., on Friday, December 29, 1967. 6 The following directors were present: Jack Billings being all of the directors of the corporation *144 and therefore a quorum. Mr. Jack Billings, President of the corporation presided over the meeting and announced that it appeared as though the corporation's earnings before tax and payment of bonus for the current year would be approximately $100,000.00. He stated that these figures were subject to verification at the close of the year, but that the $100,000.00 estimate should be reasonably accurate. This profit figure is somewhat less than the profits earned by the corporation in the prior year, but the prior year was a record year and in view of continued expansion of the corporation, particularly in the grocery field, the results of the corporation's operation during the past year were quite good. Mr. Billings stated that there was presently a dispute with the Internal Revenue Service concerning payments which he had received from Hamilton Oil Company as his part of the profits of that venture which had been going on since 1955. It is the position of the Internal Revenue Service that the income which Mr. Billings has received from Hamilton Oil Company is in fact chargeable to X-L Service, Inc. and that in turn his receipt of the money constitutes a dividend. The matter *145 is presently being disputed, but it is believed appropriate for the corporation to take this situation into consideration in determining Mr. Billings bonus for the year. In the past, Mr. Billings has considered the income that he received from Hamilton Oil Company to be his regular income and the corporation has paid a bonus at the end of the year based upon its operations and success during the year. Mr. Billings suggested to the meeting that at least for the time being, the Hamilton Oil Company income be reported as income of the corporation, that it be considered as his regular monthly compensation and that a bonus be declared at the end of each year. 7 After consideration of the situation, it was considered that in view of the difficulties with the Internal Revenue Service, the income received by Mr. Billings from Hamilton Oil Company should be reported as income of X-L Service, Inc., at least for the time being, and that Mr. Billings should be paid a bonus based upon and determined by a percentage of the net profits of the corporation, exclusive of the Hamilton Oil Company income. It was pointed out that Mr. Billings performs a varied number of managerial type functions *146 on behalf of the corporation, that in addition to his being chief executive officer and in overall charge of the operation of the corporation, he acts as its real estate agent, its real estate manager, its purchasing agent, its station and store supervisor, its architectural planner and he is the person who has been solely responsible for the successful expansion of the corporation into the coin operated laundry and grocery fields. As a result, the services performed by Mr. Billings on behalf of the corporation are normally those performed by several individuals rather than only one. In view of the fact that it is to be considered that the income which Mr. Billings receives from Hamilton Oil Company constitutes his regular monthly compensation, it was recommended that he be paid an annual bonus in a sum equal to twenty-five (25%) percent of the net before tax income of the corporation, exclusive of the income received from Hamilton Oil Company. In this manner, Mr. Billings will be compensated for his services on behalf of the corporation in direct relation to the financial success of the corporation. After consideration of the proposal, the same was deemed to be in the best interests *147 of the corporation and to constitute fair and reasonable compensation to Mr. Billings. Whereupon, on motion duly made and seconded, the following resolutions were unanimously adopted: BE IT RESOLVED that the compensation of the President of this corporation be and the same is hereby fixed as the amount of income received from Hamilton Oil Company on a monthly basis and in addition thereto an 8 annual bonus in the amount of twenty-five (25%) percent of the net before tax income of the corporation exclusive of the income received from Hamilton Oil Company. The meeting then proceeded to a consideration of the tax dispute currently in process and Mr. Billings explained that the position of the Revenue Service is that the income which he has been receiving from Hamilton Oil Company constitutes income to X-L Service, Inc., consequently a tax deficiency has been proposed against the corporation. Counsel for the corporation has recommended that the alleged tax deficiency be paid, a claim for refund be filed and suit be instituted in the Federal District Court for a determination of the tax consequences and recovery of the tax paid. It was determined that the matter should be left *148 in the hands of the President for his decision as to the proper course to take. Petitioner neither reported the payments made to Billings as income in 1967 nor claimed them as a deduction for salary paid in that year. In 1967 the Federal corporate income tax return of petitioner shows $1,131.08 in discounts earned. No employee of petitioner would have been permitted to personally receive these discounts. Petitioner claimed as a deduction on its Federal income tax return the amount of $25,000 as compensation for officers during 1967. Billings received that amount on February 21, 1968. No other compensation was paid to Billings by petitioner. Petitioner has never formally declared or paid a dividend to its stockholder. As of December 31, 1967, it had retained earnings of $226,302.23. 9 The original group of independent dealers was enlarged in 1967 with the addition of several more independents. Billings was not instrumental in obtaining these additional participants. Nor was he able to recall any instance where he personally prevailed upon an outsider to join the buying group. These independent station owners have never held themselves out to be a partnership, *149 joint venture or any other entity. They have never filed any Federal tax returns indicating the existence of such an intent. In order to obtain the rebates individually it was necessary that they pool their buying power in order to enable Hamilton Oil Company to get the lower volume prices offered by refineries. Jack Billings, in addition to owning all of petitioner's stock, was also the sole stockholder and president of Jack Billings Ford, Inc., and the major stockholder and employee of X-L Oil Company, a small tire retreading business. Billings received no salary from the Ford dealership during 1967 and received only $1,390.20 as salary from X-L Oil Company. The gross sales of petitioner have steadily increased-rising from $517,224.20 in 1955 to $1,992,459.37 in 1967. The following table shows gross sales, net profit, business paid to Billings and rebates from Hamilton Oil Company paid to Billings: 10 Net Profit
(Before Bonus and tax) Year
Gross Sales
Bonus
Rebates 1955
$ 517,224.20
$ 5,180.52
$12,000.00
$ 1,753.64
1956
824,321.05
17,853.25
9,000.00
6,247.31
1957
979,480.79
34,075.55
11,000.00
5,39 4.95
1958
1,023,140.60
9,892.57
4,500.00
22,371.73
1959
1,019,659.28
12,779.52
5,250.00
23,291.51
1960
968,707. 41
29,892.41
5,000.00
26,320.03
1961
996,754.04
35,343.93
11,000.00
36,442.05
1962
948,895.28
15,129.51
-0-
2 9,622.77
1963
1,133,688.84
34,221.53
10,000.00
31,302.30
1964
1,332,778.23
45,932.00
22,000.00
40,569.42
1965
1 ,647,709.76
78,158.75
40,000.00
54,765.33
1966
1,816,874.78
107,051.88
50,000.00
39,441.92
1967
1,992,459.37
101,794.51
25,000.00
35,051.25
*150 By 1967 there were ten gas stations, three grocery stores and two wash-a-terias operated in seven different towns by petitioner. Billings spent almost all of his time handling petitioner's business affairs. Only if "calamity" struck did he concern himself with the other business ventures. In 1967 the petitioner employed 61 persons. ULTIMATE FINDINGS 1. The amount of $35,051.25 paid to Billings by Hamilton Oil Company in 1967 was earned by and is taxable to the petitioner as a reduction in its cost of goods sold. 2. The payments, totaling $35,051.25, received by Billings were not intended to be compensation for services rendered to petitioner at the time they were made. 11 OPINION As a member of a purchasing pool, the petitioner enabled Hamilton Oil Company to receive a lower price on its petroleum purchases. Other corporate members of the pool received direct benefits of the joint purchasing power in the form of credit memoranda from Hamilton Oil Company. Petitioner did not so participate. Instead, its cost savings were passed directly to Jack Billings, who is its president and only shareholder. The business purpose of such relationship was to make it possible *151 for Hamilton Oil Company to obtain a lower price which would be passed on to petitioner. During 1967 five firms participated in the buying pool. These firms purchased in excess of 23 million gallons of fuel and received $162,208.65 in such purchase allowances. Petitioner purchased 22 percent of the gallonage and received 23 percent of the total purchase allowances. Jack Billings received a regular monthly check covering the rebates on the petitioner's purchases. Petitioner was billed for and billed the Memphis "dock" price for its fuel. The rebates were not accounted for in any way by petitioner. It did not reduce its cost of goods sold or reflect the payments as salary to Billings either as the checks were received or as the rebates were earned. In his notice of deficiency respondent explained that the petitioner had overstated its cost of goods sold by the total 12 amount ($35,051.25) of the rebates paid to Billings in 1967. That amount was therefore included in petitioner's gross income. Petitioner's position is three-pronged. First, it argues that Jack Billings entered into a joint venture with Hamilton Oil Company in his individual capacity and not as an agent *152 of petitioner, thus making the rebates his taxable income rather than the income of petitioner. Second, it contends that, if the rebate payments are includable in petitioner's gross income, such payments are nonetheless deductible as regular monthly compensation to Billings in amounts exactly equal to those received by him. And, finally, the petitioner asserts that such compensation is reasonable. Respondent counters with these arguments: (1) That the rebates constitute taxable income to petitioner because Billings was acting in an agency capacity for petitioner; (2) that when the rebate payments were made to Billings they were not intended to be compensation for services rendered by him to the petitioner; and (3) that, notwithstanding the rebates, Billings was adequately compensated by petitioner. It is apparent that respondent considers the rebate payments as dividends to Billings. Respondent points out, and we think correctly so, that , affirmed (C.A. 4, 1963), states the applicable principles to be used in determining whether 13 or not the rebate payments actually constitute income to *153 petitioner. [3] It is clear that the arrangement between the petitioner, Billings and Hamilton Oil Company was beneficial to all parties but that Hamilton would have dealt with petitioner alone if the opportunity presented itself. Petitioner was purchasing 22 percent of the oil products and it was this buying power that Hamilton needed to obtain its price. Hamilton's profit was to come from selling at the dock price to other independent dealers. Its margin existed in substantial part because of the petitioner's purchases. Petitioner attempts to distinguish , on the ground that Billings was involved in a joint venture for which he assisted in obtaining other customers. The inability of Billings to testify as to the new customers he was supposed to have developed leads us to believe that he was not attempting to obtain new customers for any venture. As we see it, these payments were made because the petitioner could provide Hamilton Oil Company with a market for its products. Categorizing this business transaction as one dependent *154 entirely on the personal relationship between Jack Billings and B. B. Hamilton ignores the importance of the arrangement to the corporation. 14 It is plain that Billings acted for petitioner with respect to the rebates, and it would be unrealistic for us to treat them as not being properly attributable to petitioner. The "joint venture" never acted as anything more than an arrangement between the corporations. No indicia of separate entry status, such as tax returns, were ever filed by the venture. See , for a discussion of the fact pattern inherent in true joint ventures. Where the issue is phrased, as petitioner does, in terms of which of two separate businesses is properly chargeable with the income produced, the concept that one need not take steps to deliberately inflate his taxable income is certainly apropos. See , reversed on other issues sub. nom. (C.A. 5, 1963); ; Briggs-Killian Co. ; . *155 All of these cases cited by the petitioner are clearly distinguishable because they involve a separation and taxation of two different businesses. By contrast, we are not dealing here with two separate businesses one operated by Billings as a proprietorship or joint venture and one in the form of a corporation selling gas through independent retail service stations. Here we have only one business 15 engaged in the independent retail gasoline business. An essential part of such business is the purchase of gasoline which is the responsibility placed on Billings as the president and dominant officer of the corporation. He conducted no other business requiring wholesale purchases of gasoline during 1967 and prior years. He performed no task other than his responsibility as petitioner's president in purchasing the gasoline. He simply acted as an agent for petitioner and his efforts were expended with the thought of furthering the best interests of the corporation. Accordingly, we conclude on this record that the rebate payments made to Billings were earned by and are taxable to the petitioner as a reduction in its cost of goods sold. Next we turn to petitioner's alternative *156 claim that it should be allowed an offsetting deduction for additional compensation to Billings equal to the rebate payments received by him. To be entitled to the claimed deduction the petitioner must have intended that the rebate payments from Hamilton Oil Company to Jack Billings be treated as his compensation. See , affirmed (C.A. 5, 1973), and cases cited therein. The burden of proof rests upon the petitioner, , and since Billings was in complete control of petitioner's affairs we must closely 16 scrutinize the relevant facts pertaining to the rebate payments. ; , affirmed (C.A. 10, 1967). We think the petitioner has failed to show the requisite intent to support the claimed deduction. Billings reported the rebate payments as "fees" from Hamilton Oil Company on his Federal income tax return for *157 1967. And the petitioner did not claim any deduction for the payments as compensation on its Federal income tax return or accrue such amounts on its books and records. Petitioner argues that the corporate minutes of December 29, 1967, demonstrate its intention that the rebate payments from Hamilton Oil Company represent compensation to Billings. To the contrary, the minutes do no more than show an attempt by the petitioner to obtain a tax deduction for payments after they had already been received by Billings. The character or treatment of the payments cannot be changed retroactively. As we stressed in , the critical point is what was the intent of the parties when the payments were made and not the intent manifested after a dispute arose. A latent defect in petitioner's intent cannot be cured later. In the final analysis the petitioner is asking us to find that its intent was whatever was necessary to entitle it to offset the rebate payments made to 17 Billings by Hamilton Oil Company from petitioner's taxable income. We will *158 not do this. The issue must be decided on what was actually done, and not on what might have been done. The petitioner and Billings considered the fees from Hamilton Oil Company as income to Billings and not as income to petitioner. This was a mistaken belief. But despite the mistake and the possibility that the petitioner might have authorized a higher salary to Billings in 1967, the plain fact is that it did not. Consequently, it is our view, under the rationale of Paula Construction Company, that the petitioner is not entitled to treat the rebate payments as compensation to Billings. To reflect the conclusions reached herein, Decision will be entered for the respondent. Footnotes
1. The locations are: four in Memphis; one each in Covington, Tennessee; Clarksdale, Mississippi; Tunica, Mississippi; Collierville, Tennessee; Counce, Tennessee, and Savannah, Tennessee. ↩
2. Nothing in the record explains the difference between the closing entries made on Hamilton's books showing a $37,564.19 adjustment and Billings' reporting of $35,051.25. ↩
3. See also the discussion in . ↩