JOHN D. ASKEW AND NONA B. ASKEW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Askew v. Commissioner
Docket No. 15898-80.
United States Tax Court
T.C. Memo 1985-100; 1985 Tax Ct. Memo LEXIS 531; 49 T.C.M. (CCH) 876; T.C.M. (RIA) 85100; March 6, 1985. E. J. Ball and Kenneth R. Mourton for the petitioners. William B. Lowrance, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as set forth below: Addition to Tax
Sec. 6653(b),
Year
Deficiency
I.R.C. 1954
1970
$126,161.00
$63,080.50
1971
2,072,321.90
1,036,160.95
1972
12,130.00
After concessions, including the section 6653(b) [1] addition to tax, the issues for decision are as follows: 1. Whether $250,000 received in 1970 by petitioner John D. Askew, and $3,000,000 received in 1971 by NOARK, Ltd., a foreign corporation controlled by petitioners, under certain letter agreements between petitioner John D. Askew and Occidental Petroleum Corporation are includable *533 in petitioners' income for 1970 and 1971, respectively, under section 61; and, if so, whether petitioners are entitled to deduct all or any part of either the $250,000 or the $3,000,000 as business expenses for 1970 and 1971, respectively, under section 162(a); 2. Whether interest in the amount of $7,766 earned in 1971 on a portion of the $3,000,000 received by NOARK, Ltd., and deposited into an interest-bearing account by petitioner John D. Askew is taxable to petitioners; [2] and 3. Whether, if we find underpayments in petitioners' taxes for the years 1970 and/or 1971, any part of the underpayments was due to petitioners' negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). [3]
*534 FINDINGS OF FACT At the time they filed their petition in this case, petitioners John D. Askew (Askew) and Nona B. Askew (Mrs. Askew), husband and wife, resided in Venezuela. Petitioners were, during the years at issue, and are citizens of the United States with a domicile in Fayetteville, Arkansas. General Background--Askew's Involvement in Various Venezuelan Corporations
Askew has worked and been involved in various business activities and ventures in Venezuela since 1945. From 1945 to approximately 1950, Askew worked as a welder for the Chicago Bridge Company. During 1951 and 1952, he was general manager of the Flint Construction and Service Company. In 1952, Askew formed Constructora Nona, C.A.., which was engaged in construction, pipeline, and tank work for the several oil companies which operated in Venezuela at the time. In 1953, Askew organized Servicios Petroleros Nona, C.A., which provided general field services to the oil companies such as gravel packing, instrument reading, and dynometer work. In 1954, Askew organized Servicios Nona, C.A.., which engaged in the trucking business. In 1966, Askew organized and owned 90 percent of the stock of Nona Drilling, *535 C.A., which owned three small drilling rigs and engaged in both shallow water and land drilling. On or about September 7, 1971, the assets of Nona Drilling were absorbed by Perforaciones Alta Mar, C.A. (Alta Mar), a Venezuelan corporation. Alta Mar was organized on or about September 15, 1970, by a group of Venezuelans. Askew, however, provided all of Alta Mar's capital; the Venezuelans held their shares in Alta Mar "for the account and to the order of" Askew. Askew was named president of Alta Mar on August 4, 1971, and Alta Mar records dated September 6, 1971, show Askew as the owner of 50 percent of Alta Mar's stock. Alta Mar's capital was significantly increased on September 17, 1971, and on November 16, 1972. As of that date, Alta Mar's shares were held as follows: Percentage of
Name
Number of Shares Owned
Ownership
John D. Askew
4,700
47 percent
Woodrow J. Wilson
4,700
47 percent
Jose Toro Hardy
600
6 percent
10,000
100 percent
The Letter Agreements
Until 1956, the Venezuelan government awarded oil drilling concessions in a manner similar to the awarding of offshore drilling leases in the United States. Various oil companies *536 would competitively bid for the right to drill on certain blocks offered by the government. A concessionaire was required to begin drilling operations and establish commercial oil production within a specified period of time. Once a concession was awarded, the concessionaire operated his concession independently as he saw fit, i.e., he drilled as many wells, produced as many barrels of oil, an sold as much oil on the international market as he would determine. The concessionaire would pay the Venezuelan government taxes according to a predetermined "reference price" based on the sale of the oil. The last oil concessions were awarded to the various oil companies then operating in Venezuela in 1956. Sometime after 1959, the Venezuelan government instituted a new system of oil production. The government formed a state-owned oil company, Corporacion Venezolana del Petroleo, known as CVP, to which the government awarded all oil production concession rights. In order to effectuate the new system and provide CVP with the capital, technology, and personnel which it lacked, the government discontinued the concession system and established a system of awarding service contracts. Under *537 the new system, private oil companies would enter into an agreement with CVP as an equal partner to provide capital, technology, and marketing know-how. The service contract concept met with resistance from the major private oil companies which were then operating in Venezuela under the concession system; thus, the Venezuelan government was required to solicit other independent oil companies which had refining and marketing capacity. Because of his long-time involvement in the Venezuelan petroleum industry, Askew was acquainted with Mr. Mobore (Mobore), Venezuela's Minister of Mines. In approximately 1966, Askew met with Mobore and they discussed the new system of service contracts. Mobore expressed his concern to Askew concerning the reluctance of the major oil companies which had been operating concessions in Venezuela to enter into service contracts with CVP, and he expressed his opinion that a new petroleum company must be brought into Venezuela to stimulate some competition among the oil companies in bidding for the service contracts. Sometime later, in mid-1967, Askew was contacted by two prominent Venezuelan citizens, Alberto Flores, Sr. (Flores) and Antonio Rivero (Rivero) *538 concerning their interest in locating an oil company not already operating in Venezuela to bid on service contracts for the exploration and development of five blocks of the South Lake Maracaibo region of Venezuela. Flores had been an employee of Standard Oil of New Jersey in Venezuela for many years, but was retired when he contacted Askew; Rivero was a retired general of the Venezuelan army, and, at the time he contacted Askew, was a well known businessman. As a result of a series of meetings with Flores and Rivero, Askew traveled to the United States in order to locate a major oil company which might be interested in entering into service contracts with CVP for the five blocks available. Askew contacted the D-X Sunray and Texas Pacific Oil Companies; however, neither was interested in undertaking the project. Askew was then introduced by the investment banking firm of Loeb, Rhoades to Dr. Armand Hammer (Hammer), then president and chairman of the board of Occidental Petroleum Corporation (Occidental) in Los Angeles, California. Askew and Hammer negotiated and executed an extensive series of letter agreements referenced by the heading "Pending Contractual Arrangements for *539 Hydrocarbon Substances Service Contracts (South Lake Maracaibo, Venezuela) by Corporacion Venezolana del Petroleo, a Public Corporation owned by Venezuela, with Occidental de Venezuela, Inc., a Delaware Corporation." The terms of the letter agreements, all of which are signed by Askew in his individual capacity and by Hammer in his capacity as president of Occidental, relevant to the issues in the instant case are summarized below. 1. Letter Agreements dated June 29, 1968
A. In the first of the letter agreements signed on this date, Askew agreed to make available to Occidental's wholly owned subsidiary, Occidental de Venezuela, Inc., "such knowledge, data and information" as he may have "for the purpose of assisting" Occidental's subsidiary in obtaining service contracts for one or more of the five blocks in the South Lake Maracaibo region which were being offered by CVP. [4] If successful, with Askew's assistance, in obtaining one or more of the service contracts, Occidental agreed to compensate Askew for his services by assigning to him a 1-percent overriding royalty covering all hydrocarbon substances produced, saved, and marketed by, through, and under the service *540 contract. B. In the second of the June 29, 1968, letter agreements, Occidental agreed to purchase and Askew agreed to sell the 1-percent overriding royalty, if granted under the conditions of the agreement discussed above, for the sum of $2,000,000 payable upon reassignment of the royalty by Askew to Occidental's subsidiary. C. In the third letter agreement signed June 29, 1968, Occidental agreed that if Occidental should grant the 1-percent overriding royalty to Askew under the terms of the first letter agreement, Occidental's subsidiary would then grant "as additional compensation to you [Askew] for the services rendered therewith" the following: (1) an additional overriding royalty of 1 percent of all hydrocarbon substances produced, saved and marketed by, through and under the service contract; and (2) an additional overriding royalty of 1/2 of 1 percent if Occidental's subsidiary should be awarded *541 a service contract for its first choice block and two other blocks other than its last choice. [5]
D. In a fourth letter agreement signed June 29, 1968, Occidental agreed to purchase and Askew agreed to sell the additional overriding royalty of 1/2 of 1 percent, if granted under the conditions described above, for the sum of $1,000,000, payable upon Askew's reassignment of the royalty to Occidental's subsidiary. 2. Letter Agreements dated September 29, 1969
A. In the first of these letter agreements, Occidental acknowledged that Askew had made available much of his knowledge, data, and information concerning the service contracts and had devoted "considerable time" to the negotiations concerning procurement of the service contracts. Askew agreed to make available "additional knowledge, data and information" for purposes of continuing with his assistance to Occidental's subsidiary in obtaining the service contracts. Occidental agreed that, if successful in obtaining service contracts from *542 CVP for the blocks designated "E," "A," and "D," it would compensate Askew for his services by assigning to him a 1/2-percent overriding royalty covering all hydrocarbon substances produced, saved and marketed by, through, and under those service contracts. B. In the second of the September 29, 1969, letter agreements, Occidental agreed to purchase and Askew agreed to sell the additional overriding royalty of 1/2 of 1 percent, if granted under the conditions described above, for the sum of $1,000,000, payable upon Askew's reassignment of the royalty to Occidental's subsidiary. C. In the third or the letter agreements dated September 29, 1969, Askew agreed that, as additional consideration for Occidental's signing of the September 29, 1969, letter agreements, if Occidental should be required to pay the 1/2 of 1 percent overriding royalty under those agreements, it would not then be under an obligation to pay the 1/2 of 1 percent overriding royalty referred to in the June 29, 1968, letter agreements. 3. Letter Agreement Concerning the Loma de Hierro Nickel Deposit
On February 4, 1970, Askew, in his individual capacity, and Hammer, on behalf of Occidental, entered into *543 a letter agreement referenced "Pending Contractual Arrangements for Developing the Loma de Hierro nickel deposit in Venezuela between the Government of Venezuela and Occidental World Wide Minerals Corporation." Similar in form to the letters concerning their agreement with respect to the oil drilling service contracts described above, Occidental first acknowledged Askew's years of experience and "fund of knowledge" concerning Venezuela's mineral law relating to the production and mining of nickel. Askew agreed to make data or information available to Occidental's subsidiary for the purpose of assisting the subsidiary in obtaining service contracts for the development and mining of the Loma de Hierro nickel deposit in Venezuela. Occidental agreed that, if successful in obtaining the service contracts, it would assign Askew, as compensation for his services, a 2-percent overriding royalty for all minerals produced or marketed under the service contracts, and it would purchase the royalty for the sum of $5,000,000 to be paid in certain designated installments. On August 31, 1970, at Askew's reguest, Occidental advanced $250,000 to Askew under the nickel deposit letter agreement. The *544 $250,000 advanced to Askew was transferred to Askew's personal account at the McIlroy Bank, Fayetteville, Arkansas; it was later deposited, on September 1, 1970, in the McIlroy Bank checking account of Nona Drilling. By letter dated November 17, 1970, Askew and Hammer, on behalf of Occidental, agreed to extend the time of performance, specified as December 31, 1970, in their February 4, 1970, letter agreement, to December 31, 1971. In the letter, the parties note that Occidental has advanced $250,000 to Askew to be credited against the amount to be paid Askew should the deal be successful. The parties also acknowledge that the February 4, 1970, letter agreement, as amended by this letter, is "in full force and effect." At some unspecified date, Occidental decided not to pursue the nickel deposit any further; the nickel deposit letter agreement was canceled by the parties. At no time during the course of their negotiations concerning the foregoing letter agreements did Askew represent to Hammer that he was acting on behalf of other individuals or corporations in entering into the agreements. Askew did indicate to Hammer, however, that he had a "great many business friends in *545 Venezuela," including Rivero, among others, who would be assisting him in his efforts to procure the service contracts and otherwise fulfill the letter agreements. Hammer met Rivero on at least one occasion; Hammer recalls that he was "very much taken by" Rivero when they met. Rivero corresponded with Hammer on several occasions. [6]
Askew's Activities Concerning Procurement of the Service Contracts
After he executed the first series of letter agreements with Occidental dated June 29, 1968, Askew traveled from Los Angeles, California, to Caracas, Venezuela, and showed the letter agreements to Rivero and Flores. On July 4, 1968, Askew executed an agreement with Rivero's wife, Luisa Dolores de Rivero Vasquez (Mrs. Rivero) [7], and Flores which provides in relevant part as follows: I, John Dee Askew, * * * hereby declare: *546 That the Venezuelan citizens Luisa Dolores Rondon de Rivero Vasquez and Alberto Eduardo Flores Troconis, both adults, residents of Caracas, the Capital of the Republic of Venezuela, * * * both businesspersons and personally competent, have, at my prior express contractual request, rendered efficient services to me, and through me, to the company known as "Occidental Petroleum Corporation" of Los Angeles, California, United States of America; they are currently still rendering such services with the same degree of efficiency, to myself as well as to the abovementioned corporation, in connection with specific important negotiations aimed at obtaining a service contract to be issued by the Corporacion Venezolana de Petroleo (Venezuelan Petroleum Corporation) to the abovementioned "Occidental Petroleum Corporation", pursuant to certain letters of agreement dated Los Angeles, June twenty-nine (29), nine-teen hundred sixty eight (1968), by the President of the abovementioned corporation, Mr. Armand Hammer, and acknowledged by me on like date; I agree to pay to my abovementioned collaborators, from the amount specified in said letters of agreement, the amount of One Million Five Hundred Thousand *547 Dollars ($1,500,000.00), or Six Million Seven Hundred Fifty Thousand Bolivers (Bs. 6,750,000.00), to be divided among them as follows: To Mrs. Luisa Dolores Rondon de Rivero Vasquez, the amount of One Million One Hundred Twenty Five Thousand Dollars ($1,250,000.00), or Five Million Sixty Two Thousand Five Hundred Bolivars (Bs. 5,062,500.00), and to Mr. Alberto Eduardo Flores Troconis the amount of Three Hundred Seventy Five Thousand Dollars, or One Illion Six Hundred Eighty Seven Thousand Five Hundred Bolivars (Bs. 1,687,500.00). * * * This agreement shall remain in effect until the signing of the service contract between "Occidental Petroleum Corporation" and the Corporacion Venezolana de Petroleo, or the Ministry of Mines and Hydrocarbons, or the National Government. * * * The undersigned, Luisa Dolores Rondon de Rivero Vasquez and Alberto Eduardo Flores Troconis, identified hereinabove, declare to have accepted the foregoing legally binding declarations, and sign this contract in two equal copies, in Caracas, on July fourth (4), nineteen hundred sixty eight (1968). *548 From July 4, 1968, until November 11, 1970, Askew, with the help of Rivero and Flores and several of their associates, was actively involved in gathering information to insure Occidental's success in obtaining the service contracts. Askew's primary task was to ascertain the contents of bids made by the other oil companies in competition with Occidental for the service contracts so that Occidental would be in the position to make the most attractive bid to CVP. [8] Askew gathered intelligence reports from both the field offices and main offices of the competing oil companies. Rivero and Flores, influential Venezuelan businessmen, gathered information by giving dinner parties and holding meetings of people involved in the Venezuelan oil business. Askew would then pass on the information he had gathered, on his own and through Rivero and Flores, to Charles Hatfield (Hatfield), vice-president and general manager of Occidental's subsidiary, Occidental Petroleum de Venezuela, C.A. During the period from July 1968 through November 1970, Askew met at least weekly, sometimes more frequently, with Rivero and Flores, and practically daily with Hatfield; Askew spent 90 percent of his time *549 in Caracas workin on the project. In order to facilitate the information gathering process by Rivero and Flores and their associates, Askew, primarily through funds of Nona Drilling, but also through his own funds and those of Servicios Petroleros Nona, S.A., advanced substantial sums, much of it in cash, to the Venezuelan nationals with the understanding that Nona Drilling would be reimbursed for such advances from the cash payment Askew was to receive from Occidental should it be successful in obtaining the service contracts. Nona Drilling also paid Askew's expenses incurred in connection with his activities for the project which Askew expected to reimburse to Nona Drilling from Occidental's cash payment. Award of the Service Contracts
On November 30, 1970, CVP notified Occidental de Venezuela, Inc. (a Delaware corporation), that its bid for service contracts on blocks *550 E, A, and D in South Lake Maracaibo had been approved. Occidental de Venezuela, Inc., elected not to enter into the service contracts; it transferred its interest in the service contracts to Occidental Petroleum de Venezuela, S.A. (a Venezuelan Corporation). Hammer considered Rivero's advice to be "largely instrumental" in Occidental's success in procuring the service contracts. Hatfield considered the services of the Venezuela nationals involved in the project "valuable and beneficial." After several months of negotiations between Occidental and CVP officials, service contracts for the three blocks were formally signed between Occidental Petroleum de Venezuela, S.A., and CVP in July 1971. [9] At the time the service contracts were signed, Askew was entitled, under the letter agreements described above, to an overriding royalty of 2-1/2 percent. Occidental was obligated to purchase 1-1/2 percent of the 2-1/2 percent royalty for the sum of $3,000,000. *551 Creation of NOARK, Ltd., and the Closing of the Letter Agreements
In anticipation of the closing of the letter agreements, Askew directed an attorney, Gallman, the law partner of Askew's attorney, E. J. Ball, to go to the Bahamas to incorporate NOARK, Ltd. (NOARK). NOARK was incorporated on February 5, 1971, in Nassau, Bahamas. It was owned by Askew and Mrs. Askew, and was formed for tax reasons. The letter agreements between Occidental and Askew were closed by the parties in Hamilton, Bermuda, on August 20, 1971. On that date, the following events took place: 1. Askew signed a document assigning his rights in the letter agreements with Occidental to NOARK. The assignment of rights was designated as a contribution of capital to NOARK, described as Askew's wholly owned corporation. 2. Occidental Worldwide Investment Corporation (Occidental Worldwide), the parent corporation of Occidental Petroleum deVenezuela, S.A., entered into an agreement with NOARK to pay NOARK a royalty of 1 percent of all the proceeds from the sale of all petroleum produced from the service contracts governing blocks E, D, and A. The royalty was paid as compensation to Askew for his services *552 in obtaining the service contracts.[10]
3. Occidental Worldwide entered into an agreement with NOARK to pay NOARK a royalty of 1-1/2 percent of the proceeds from the sale of all petroleum produced from service contracts for blocks E, D, and A. The royalty was paid as compensation to Askew for his services in obtaining the service contracts. 4. Occidental Worldwide entered into an agreement with NOARK whereby NOARK agreed to sell and Occidental Worldwide agreed to purchase the 1-1/2-percent royalty agreed to above for the purchase price of $3,000,000. Receipt and Disbursement of the $3,000,000
On August 23, 1971, the sum of $3,000,000 was transferred from Occidental Worldwide's account at the London branch of First National City Bank to the Canadian Imperial Bank of Commerce in Toronto, Canada, for the account of the Canadian Imperial Bank of Commerce, Nassau, Bahamas, branch for deposit to NOARK's checking account. Askew and/or Mrs. Askew exercised custody and control over NOARK's *553 checking account. For example, on September 1, 1971, Askew deposited $1,000,000 from the account in a time deposit for 33 days at 9-percent interest; on October 4, 1971, Askew redeposited the $1,000,000 plus $8,136.99 interest earned into the NOARK checking account. On March 22, 1972, Askew invested $100,000 from the NOARK account in a 1-year deposit at 5.75-percent interest; on June 11, 1974, Askew redeposited the $100,000 plus $19,978.95 interest earned into the NOARK account. In approximately May 1971, Rivero died; prior to his death, however, he made arrangements with his wife, Mrs. Rivero and her attorney, Mr. Quijano, to receive the money which Askew was obligated to pay him pursuant to their contract of July 4, 1968, after the closing of the letter agreements. At some time after the $3,000,000 was transferred to the NOARK account, Askew arranged to meet with Mrs. Rivero and her attorney at her home on the evening of September 6, 1971. In accordance with Mrs. Rivero's instructions, before going to the Rivero home that evening, Askew first went by car with Mrs. Askew to the Banco Latino Americana de Venezuela in Caracas and cashed a NOARK check (check No. 1 dated September 6, 1971) *554 for the sum of $100,000 in cash (U.S. dollars) which they delivered to Mrs. Rivero on their arrival. At the request of Mrs. Rivero and her attorney, Askew and Mrs. Askew disbursed the following funds from the NOARK checking account to Mrs. Rivero, several of her relatives, Flores, and certain associates of Rivero and Flores who had provided services during the project: Check
Item
No.
Date
Payee
Amount
1
1
9/6/71
Banco Latino Americana
$100,000
2
2
9/6/71
Alberto E. Flores
106,400
3
3
9/6/71
Chandra Thakur
46,100
4
4
9/6/71
Carmen Rosa Cumare
20,000
5
5
9/6/71
Carmen Rosa Cumare
40,000
6
6
9/6/71
Raul Cumare Hernandez
25,000
7
11
9/6/71
Luisa Dolores de Rivero V.
100,000
8
12
9/6/71
Luisa Dolores de Rivero V.
116,900
9
13
9/13/71
Robert C. Thompson
28,800
10
14
9/13/71
Luis de Leon
41,000
11
16
9/18/71
Gabriel Antonio Rondon
50,000
12
17
9/18/71
Gabriel Antonio Rondon
50,000
$724,200 In the margin of their July 4, 1968, contract, Mrs. Rivero and Flores made the following signed statements: I, Luisa Dolores Rondon de Rivero Vasquez, have received from Mr. John Askew *555 the amount of Two Hundred Sixteen Thousand Nine Hundred Dollars ($216,900.) as payment for this contract. I hereby waive any further claim hereunder. * * * I, Alberto Eduardo Flores Troconis have received from Mr. John Askew the amount of One Hundred Six Thousand Four Hundred Dollars ($106,400.) as payment for this contract. I hereby waive any further claim hereunder. In addition to the direct disbursements to those involved in the project listed above, Askew and/or Mrs. Askew disbursed the following additional amounts in reimbursement to Askew, Nona Drilling, and its successor, Alta Mar, for amounts previously advanced to the Venezuelan nationals and for Askew's expenses in connection with the project: Check
Item
No.
Date
Payee
Amount
1
Wire
8/27/71
Nona Drilling
$500,000
Transfer
2
10
9/6/71
John Askew
15,000
3
Wire
9/15/71
Perforaciones Alta Mar
232,000
Transfer
4
18
10/7/71
Perforaciones Alta Mar
350,000
5
19
12/2/71
Perforaciones Alta Mar
200,000
$1,297,000
Askew and/or Mrs. Askew also disbursed the following other amounts from the NOARK account: Check
Item
No.
Date
Payee
Amount
1
Wire
10/7/71
Acct. No. 100050 CA FRA SA
$616,000
Transfer
Swiss Bank Corp., Panama
2
Wire
10/22/71
Acct. No. 100080 CA FRA SA
200,000
Transfer
Swiss Bank Corp., Panama
3
Wire
3/28/72
E. J. Ball
10,000
Transfer
4
20
5/1/74
J. L. Brandt
20,000
5
21
5/30/74
Gustavo Conde
20,000
6
22
6/25/74
Gustavo Conde
14,000
$880,000
*556 Petitioners' Tax Returns for 1970--1972 and Subsequent Procedural Events
Petitioners tiemly filed a joint Federal income tax return dated April 13, 1971, for 1970, reporting gross income of $260,731. Petitioners did not include in gross income the $250,000 received by Askew under the nickel deposit letter agreement. On October 27, 1976, petitioners' attorney, E. J. Ball, executed a Form 872, Consent Fixing Period of Limitation Upon Assessment of Income Tax, by which petitioners consented to the extension of the statute of limitations for assessment of their 1970 income tax to June 30, 1978. Typed onto the Form 872 is the following restrictive language: This consent is valid only if Section 6501(e) of the Internal Revenue Code of 1954, or the corre-sponding provisions of prior law is applicable. Petitioners timely executed subsequent consent forms for 1970 on December 24, 1977, and March 1, 1979, extending the statute of limitations to June 30, 1979, and June 30, 1980, respectively. Petitioners filed joint Federal income tax returns for 1971 and 1972 on June 15, 1972, and April 15, 1973, respectively. Petitioners did not report as income *557 on their 1971 return the $3,000,000 received by NOARK under the Occidental letter agreements. Prior to the expiration of the 3-year statute of limitations for the assessment of their 1971 and 1972 income taxes, petitioners timely executed Forms 872 on November 22, 1974, extending the period for assessment of their 1971 income tax to June 15, 1976, and on October 13, 1975, extending the period for assessment of their 1971 and 1972 income tax to June 30, 1977. Petitioners subsequently executed additional Forms 872 extending the period for assessment of both their 1971 and 1972 income taxes to June 30, 1980. The notice of deficiency, setting forth respondent's determination of petitioners' income tax liability for the years 1970, 1971, and 1972, was sent to petitioners on May 23, 1980. OPINION 1. Taxability of Amounts Received Under the Letter Agreements
A. 1970--Taxability of $250,000 Received by Askew Under the Nickel Deposit Letter Agreement
The first issue for decision is whether, and to what extent, petitioners must include in their gross income the $250,000 payment made in 1970 by Occidental to Askew under the nickel deposit letter agreement. As a general *558 rule, the burden of proof concerning this issue would be on petitioners, Welchv. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In this case, however, assessment of a deficiency for 1970 is barred by the 3-year statute of limitations under section 6501(a) unless respondent demonstrates that an exception to the usual 3-year statute of limitations is applicable. As indicated in our findings, petitioners specifically agreed to extend the period of limitations on assessment of their 1970 income tax only if the 6-year statute of limitations under section 6501(e)(1)(A) is applicable. Thus, for 1970, respondent has the burden to establish, by a preponderance of the evidence, that petitioners omitted from their 1970 return gross income in an amount in excess of 25 percent of their reported gross income of $260,731. Armes v. Commissioner,448 F.2d 972, 974 (5th Cir. 1971), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Williamson v. Commissioner,27 T.C. 647, 659 (1957). If respondent shows that petitioners omitted a sufficient amount of gross income to lift the bar of the statute of limitations, *559 petitioners have the usual burden of showing any offsetting deductions to which they may be entitled. After careful consideration of the evidence on this issue, we conclude that the $250,000 payment is includable in petitioners' income for 1970 and, therefore, petitioners did omit from gross income an amount in excess of 25 percent of the gross income which they reported in 1970. We sustain respondent's determination. Respondent presented evidence to show that on August 31, 1970, Occidental, at Askew's request, advanced $250,000 under the nickel deposit letter agreement to Askew's account at the McIlroy Bank in Fayetteville, Arkansas, and that the next day, September 1, 1970, Askew deposited the advance into the account of his corporation, Nona Drilling, at the same bank. The nickel deposit letter agreement, entered into by Askew in his individual capacity, expressly provides that payments made thereunder constitute "compensation" to Askew, and Askew alone, for services rendered by him to Occidental's subsidiary in connection with its efforts to obtain a service contract for the nickel deposit. As such, therefore, the $250,000 advance under the letter agreement is includable *560 in Askew's gross income under section 61(a) which provides that "gross income means all income from whatever source derived, including * * * (1) Compensation for services * * *." Petitioners do not dispute the basic facts presented by respondent, i.e., that Askew requested and received payment of $250,000 from Occidental and that such payment was deposited into the Nona Drilling account at the McIlroy Bank. They disagree with respondent, however, concerning the tax treatment to be accorded the transaction. Although their position on this issue is not altogether clear, petitioners appear to make two alternative arguments concerning the $250,000 payment. First, they contend that the payment to Askew is not includable in their gross income because Askew acted as the agent of Rivero and Flores in contracting the letter agreement and, thus, he was merely a conduit through which the money was ultimately paid to certain Venezuelan nationals who were associated with Rivero and Flores. Second, they contend that if the payment is includable in their gross income, it should be considered to have been used in its entirety as a deductible business expense under section 162(a). At trial, *561 Askew testified that when Occidental informed him of its intention to cancel the nickel deposit project, "I told him [Hammer] I had been out $250,000, and I would like to recover my money." Askew further testified that he, through his corporation, Nona Drilling, had made payments totaling $250,000 to two Venezuelan nationals, Jose Maria de Castro Acosta and Israel Osorio Acosta, associates of Rivero and Flores, who had performed services in connection with the nickel deposit project. Askew described Jose Maria de Castro Acosta in general terms as "a man that was very much interested in the mineral mines of all kinds," and Israel Osorio Acosta as "an expert in the mining business." Askew did not identify, in his testimony, the type of services performed by either of the two men in connection with the nickel deposit project, or specify the dates on which the services were performed. Neither one of these individuals testified as witnesses. Askew stated that he thought the payments were made in cash taken from the Nona Drilling account, but he did not state when the payments were made. In support of Askew's testimony concerning the cash payments made by Askew through Nona Drilling *562 to the two Venezuelan nationals, petitioners presented two documents in evidence. The first document is a letter dated November 17, 1970, written by Askew to Jose Maria de Castro Acosta and referenced: "In Re Letter dated February 14, 1970, from Occidental Petroleum Corporation to John D. Askew." This letter discusses a certain letter agreement between Occidental and Askew dated February 14, 1970; the substance of the letter agreement referred to is not identified. The letter also contains a notation stating that $100,000 has been paid to and received by Jose Maria de Castro Acosta and that such amount will be deducted from a final payment of $1,000,000. The letter is signed and marked "accepted" on March 10, 1971, by Jose Maria de Castro Acosta. The second document is entitled "Final Release" which purports to have been granted on September 30, 1971, by Israel Osorio Acosta. In this document, Israel Osorio Acosta acknowledges receipt as "sufficient compensation" of a payment of $250,000 made "by John D. Askew, or by a company controlled by him," and he releases from any further claims Askew, Mrs. Askew, Nona Drilling, Alta Mar, and all other corporations in which the Askews *563 own a 10-percent or greater interest. The document does not specify the services performed by Israel Osorio Acosta for which such compensation was paid. Petitioners' evidence on this issue is insufficient, in our view, to support either of their alternative legal theories. It is not corroborated by the testimony of any of the alleged recipients of these funds or any documentation showing specifically for what purposes they were expended.Essential to a conclusion either that Askew was only a conduit through which the $250,000 was paid to the Venezuelan nationals, [11] or that the $250,000 was reimbursement to Nona Drilling for expenses incurred in performance of the nickel deposit letter agreement, is a basic factual determination that payments totaling $250,000 were in fact made by Nona Drilling to the named Venezuelan nationals in connection with the Nickel deposit project. Askew's testimony and the documents presented in support thereof do not lead to such a determination. *564 Askew's testimony concerning this issue can only be characterized as vague and contradictory at best. He could describe the two Venezuelan nationals to whom he claims to have made the payments only in general terms as persons "interested in the mineral mines of all kinds" and "an expert in the mining business," respectively; he failed to describe with any specificity either the services performed by the two men which would have warranted such large payments, or when the services were performed. Askew's testimony is undermined by the fact that the documentary evidence set out in our findings makes clear that the nickel deposit letter agreement was still in force as of November 17, 1970, when the parties agreed to extend the time of performance of their February 14, 1970, letter agreement. This was some 3 months after the $250,000 payment was made by Occidental. Askew's assertion that the payment was made when Occidental decided to cancel the deal is in conflict with this evidence and leads us to question the accuracy of his testimony. Further, the two documents presented by petitioners and described above actually weaken, rather than support, Askew's testimony. The documents *565 reflect payments to two Venezuelan nationals totaling $350,000, whereas Askew claims that only a total of $250,000 was paid to both men. Neither of the documents refers specifically to the nickel deposit project; nor do either of the documents reflect that payment was made for services rendered in connection with the project or under the nickel deposit letter agreement of February 14, 1970. The letter signed by Jose Maria de Castro Acosta refers to a February 14, 1970, agreement between Occidental and Askew; however, none of the letter agreements concerning the nickel deposit project contained in the record bear such a date. Given the fact that Askew and Hammer signed so many letter agreements on many different dates, it is quite possible that the February 14, 1970, letter agreement referred to in the Jose Maria de Castro Acosta letter may relate to a transaction other than the nickel deposit project. The dates of the documents themselves also are inconsistent with Askew's testimony. Jose Maria de Castro Acosta accepted Askew's letter on March 10, 1971, and Israel Osorio Acosta signed the Final Release on September 30, 1971. Askew testified that he was "out" by $250,000 when *566 Occidental advanced him that sum in August 1970. The documents, both of which are dated 1971 by the Venezuelan nationals, suggest the possibility that Askew did not make payments to the two men until some months after August 1970. We are aware that the $250,000 advance was intended, according to Hammer, to reimburse Askew for some expenses that he had incurred. We also recognize the likelihood that Askew did, in fact, use at least part of the money for reimbursement purposes. We have no way of knowing, however, in what year he paid or incurred the expenses, i.e., in 1970 when the letter agreement was signed and Occidental advanced the money or in 1971 when one of the two Venezuelan nationals gave the purported "Final Release." Nor do we have any way of knowing for what purposes the expenses were incurred. The complete absence of any documentation to support individual items of expense precludes an allowance under the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). To attempt to make such an allowance would require pure conjecture. In summary, respondent has shown that Occidental paid Askew $250,000 on August 31, 1970, pursuant to a letter agreement *567 in which Occidental obligated itself to pay Askew "compensation" for services rendered. This evidence is sufficient to establish a prima facie case that petitioner realized income in that amount in 1970 and that the bar of the statute of limitations on assessments was lifted under section 6501(e)(1)(A). We are not convinced that Askew was merely a conduit of these funds to others. Nor do we find persuasive the uncorroborated and contradictory evidence that Askew through Nona Drilling used the $250,000 to cover deductible expenses. Accordingly, we hold that petitioners' taxable income for 1970 must be increased by the $250,000. B. 1971--Taxability of $3,000,000 Received by NOARK Under the Oil Drilling Service Contracts
The next issue for consideration is whether, and to what extent, petitioners must include in their gross income the $3,000,000 payment made in 1971 by Occidental Worldwide to NOARK, petitioners' wholly owned corporation, under the series of oil drilling service contract letter agreements. The notice of deficiency for 1971 was timely mailed to petitioners within the 3-year statute of limitations period; petitioners, therefore, have the burden of proof on this *568 issue. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Again, the parties are in basic agreement concerning the pertinent facts with respect to the $3,000,000 payment. On August 23, 1971, Occidental Worldwide transferred $3,000,000 to NOARK's account at the Nassau, Bahamas, branch of the Canadian Imperial Bank of Commerce. This transfer was made pursuant to Occidental's obligations to Askew under the series of letter agreements entered into between Occidental and Askew with respect to Occidental's procurement from CVP of oil drilling service contracts for certain designated blocks of the South Lake Maracaibo region of Venezuela.The payment was made to NOARK pursuant to Askew's assignment of his rights under the letter agreements to NOARK, his wholly owned corporation, which he had formed for puposes of receiving and disbursing the payment from Occidental Worldwide. The parties again, however, disagree concerning the tax consequences flowing from Occidental's $3,000,000 payment to NOARK. Respondent contends that the $3,000,000 payment to NOARK constitutes taxable income to petitioners in its entirety. He contends that Askew signed all of the letter *569 agreements in his individual capacity; that the agreements provide that payments made thereunder are specifically designated as compensation to Askew alone for his services to Occidental; and that Askew's assignment to NOARK of all rights under the letter agreements was merely an anticipatory assignment of income properly taxable to Askew himself under section 61(a). Petitioners, on the other hand, contend that they are not taxable to any extent on the $3,000,000 payment from Occidental Worldwide to NOARK. At trial, Askew testified as follows: That he, at all times, acted in his fiduciary capacity as president of his corporation, Nona Drilling, when he dealt with Hammer and the Venezuelan nationals; that he acted as the agent of two groups of Venezuelan nationals, the Rivero-Flores group and a group consisting of Jose Luis Brandt, Emilio Conde Jahn, and Jose Toro Hardy (the Brandt-Jahn-Hardy group), in negotiating and contracting the letter agreements with Occidental with the understanding that the Venezuelan nationals would receive the $3,000,000 cash payment under the letter agreements and his corporation, Nona Drilling, would receive only the remaining 1-percent overriding royalty *570 and some drilling contracts from Occidental; that from 1968 through 1971, he advanced substantial sums through Nona Drilling to the Venezuelan nationals involved in the service contract project with the understanding that Nona Drilling would be repaid for the advances from the $3,000,000 payment; that Nona Drilling paid all of his personal expenses incurred in connection with the project; that when NOARK received the $3,000,000 payment from Occidental Worldwide, he treated the NOARK account as a trustee account, and he disbursed the bulk of the payment to the Venezuelan nationals to whom he was obligated under contract and to his corporations, Nona Drilling and its successor, Alta Mar, in reimbursement for sums previously advanced to the Venezuelan nationals and for his business expenses. In sum, petitioners contend that Askew, through NOARK, acted only as the agent of Nona Drilling and the Venezuelan nationals, and consistent with his fiduciary duty, he was merely a conduit through which all of the $3,000,000 was ultimately passed on either to other individuals to whom he was obligated to make payment, or to his corporations for sums previously advanced. They contend that neither *571 Askew nor his corporations made any claim to, or benefited in any way from, any of the $3,000,000. For the reasons discussed below, we conclude that the answer lies somewhere between the extreme positions advocated by the parties. We do not agree with respondent that petitioners are taxable on the entire amount; petitioners have succeeded in demonstrating that they are not taxable on at least a portion of the $3,000,000 payment. Petitioners have not, however, presented evidence sufficient to convince us that they are not taxable to any extent on the payment. Bearing in mind that petitioners have the burden of proof on this issue, we have redetermined the deficiency using our best judgment based on what we consider to be the credible evidence presented to us. At the outset, we conclude, contrary to his assertions otherwise, that Askew acted on his own behalf when he negotiated and contracted the letter agreements with Occidental. Nothing in the letter agreements themselves, which we consider to be the most persuasive evidence concerning the substance of the agreement between Askew and Occidental, indicates that Askew was acting on behalf of either his corporation, Nona Drilling, *572 or any of the Venezuelan nationals. All of the agreements were signed by Askew in his individual capacity, whereas Hammer signed the letters on behalf of Occidental; the agreements provide that Askew will be compensated for services rendered by him to Occidental; there is nothing to suggest that services will be rendered to Occidental by any other individuals. Further, there is no evidence, other than Askew's self-serving testimony, that Askew ever indicated to Hammer that he was acting on behalf of his corporation or of anyone else in entering into the letter agreements. Hammer, whose testimony was taken by deposition, has no such recollection. Askew told Hammer, according to Hammer's testimony, that he had friends in Venezuela who would be helping him in his efforts to gather information. Such a statement, however, by no means suggests thta Askew was acting as the agent for these "friends" in entering into the letter agreements.We find it hard to believe that Askew, who spent 90 percent of his time during the period from July 1968 through November 1970 working on the project, had no expectation of personal gain for his efforts except the residual overriding royalty interest *573 and some drilling contracts for his corporation, Nona Drilling. Petitioners' contention that Askew was acting as agent for his corporation, Nona Drilling, is without merit. They cite Arlex Oil Corp. v. Commissioner,T.C. Memo. 1967-235, and X-L Service, Inc. v. Commissioner,T.C. Memo. 1973-148, as support for the proposition that receipt of money by a stockholder or an officer of a corporation should properly be considered as income to his corporation when he receives such money on behalf of the corporation in his capacity as stockholder or officer. While we have no quarrel with the legal principle stated in these cases, we do not find the principle applicable here. There is no evidence, other than Askew's bald assertion that everything he did was for Nona Drilling, to support a conclusion that Askew was acting on behalf of Nona Drilling during any of his dealings with Occidental. Nona Drilling was in the business of deep and shallow drilling, not of procuring service contracts for oil companies. The 1-percent overriding royalty which Askew claims to have obtained on behalf of his corporation has nothing whatever to do with Nona Drilling's *574 business. Although Askew's claim that in entering into negotiations with Occidental he also was interested in obtaining drilling contracts for Nona Drilling is related to Nona Drilling's business, none of the letter agreements in any way mention or suggest such a possibility. Thus, whether or not Askew did obtain such drilling contracts is a matter separate from his work under the letter agreements. Petitioners have presented no evidence to show that the personal services rendered by Askew to Occidental under the letter agreements, i.e., gathering information to assist Occidental in procuring the service contracts, were of the same type as he performed for Nona Drilling to carry on its oil drilling business. We think the evidence shows that Askew acted outside his capacity as president of Nona Drilling. We are thus unable to find that Askew received the entire $3,000,000 payment on behalf of Nona Drilling or its successor, Alta Mar. Similarly without merit is petitioners' contention that Askew was acting as agent for two groups of Venezuelan nationals, the Rivero-Flores group and the Brandt-Jahn-Hardy group. In this regard, petitioners cite Armstrong v. Republic Rlty. Mtg. Corp.,631 F.2d 1344 (8th Cir. 1980), *575 a case which discusses general agency principles. Petitioners contend that Askew's actions with respect to the letter agreements meet the requirements of an agency relationship between Askew as agent and the Rivero-Flores and Brandt-Jahn-Hardy groups as principals, and, therefore, it is the principals, not Askew, who should be considered to have received the $3,000,000 payment. Petitioners' evidence on this issue does not convince us that this is the case. Quoting from section 1 of the Restatement (Second) of Agency, the Armstrong court stated (at 1348) the following: Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. Askew's vague and uncorroborated testimony in this regard is insufficient to convince us that any of the foregoing factual elements of agency exist. In fact, as we view the evidence set forth in our findings, the description *576 of the relationship between Askew and both the Rivero-Flores group and the Brandt-Jahn-Hardy group could lead to quite the opposite conclusion, i.e., that it was Askew who was the principal in control of the project and the Venezuelan nationals who worked on Askew's behalf. As to Rivero and Flores, the evidence shows that Askew was obligated, under written contract, to pay them a sum certain, $1,500,000, for their services rendered to Askew in connection with their information gathering efforts. The evidence is also clear that Hammer and Hatfield, Occidental officials, were aware of their involvement in the project and considered their efforts instrumental in Occidental's success in procuring the service contracts. None of the evidence, with the exception of Askew's self-serving statements, however, demonstrates an understanding between Askew and Rivero and Flores that Askew was to act on their behalf, oir that Rivero and Flores would be in control of the undertaking. As we view the evidence, Rivero and Flores had no role other than information gathering for which they were paid; petitioners have failed to prove that they were in control of the project. Petitioners' evidence *577 with respect to the involvement of Brandt, Jahn, and Hardy as principals in the service contract project is even less convincing than their evidence concerning Rivero and Flores. Petitioners contend that Brandt, Jahn, and Hardy were also involved in gathering information for Occidental; however, Askew's testimony concerning their alleged involvement is too vague to support a conclusion that they were in control of Askew's activities. Askew testified that Hardy did an economic study for the project for which he was paid, but he failed to identify any services performed by either Brandt or Jahn. In contrast to the documentary evidence presented concerning Askew's obligation to pay Rivero and Flores, petitioners produced no written agreement or any other credible corroborating evidence which would demonstrate the involvement of Brandt, Jahn, and Hardy in the project to the degree claimed by Askew. Petitioners also claim, with respect to Brandt, Jahn, and Hardy, that, in return for services rendered in connection with the service contract project, Askew, through Nona Drilling, advanced to Jahn and Hardy on September 9, 1970, 100,000 Venezuelan bolivars for the original capital of *578 Alta Mar and granted Alta Mar's incorporators an option to purchase the assets of Nona Drilling; and that during the period from September 9, 1970 to August 5, 1971, Askew, through Nona Drilling, advanced Jahn and Hardy a total of $100,000 for the account of Alta Mar with the understanding that Nona Drilling would be reimbursed from the $3,000,000 payment; and that on September 6, 1971, the option was canceled for nonpayment, and Askew merged Nona Drilling into and took control of Alta Mar. Although we accept Askew's testimony that Brandt, Jahn, and Hardy did provide some services in connection with the project and that in payment Askew helped them set up Alta Mar, Askew's testimony is insufficient to support a conclusion that Brandt, Jahn, and Hardy did anything more than provide services. There is no evidence to show that they were in control of the project. Thus, we do not accept petitioners' argument. Having decided that Askew was not the agent of either his corporation or of the Venezuelan nationals, and that he acted on his own behalf, we do not conclude, however, that he is necessarily taxable on the entire $3,000,000 payment by Occidental as urged by respondent. We do *579 think it clear that petitioners are taxable on at least a portion of the payment. Under assignment of income principles, Askew's transfer of his rights under the letter agreements to NOARK and the eventual receipt of the $3,000,000 payment by NOARK will not allow petitioners to escape taxation on income paid as compensation for services rendered by Askew. See Lucas v. Earl,281 U.S. 111 (1930); United States v. Basye,410 U.S. 441 (1973). The only question remaining, then, is to what extent petitioners are taxable. Contrary to respondent's position, we are convinced that Rivero and Flores and Brandt, Jahn, and Hardy were involved with and did aid Askew in his efforts to gather information in connection with the service contract project; that Askew was initially obligated, under written contract, to pay Rivero and Flores $1,500,000, one-half of the $3,000,000, as compensation for their services; that Askew, through Nona Drilling, did advance certain amounts, much of it in cash, to them and their associates and to Brandt, Jahn, and Hardy with the understanding that Nona Drilling would be reimbursed; and that Nona Drilling paid Askew's significant *580 expenses incurred in connection with his activities for the project which he also expected to reimburse. To the extent that Askew actually paid the Venezuelan nationals for their services in connection with the project and reimbursed Nona Drilling and its successor Alta Mar for amounts previously advanced by Nona Drilling in connection with the project, we conclude that Askew paid deductible expenses or acted merely as a conduit. Petitioners need not, therefore, include those amounts in income. See Diamond v. Commissioner,56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974); Shaara v. Commissioner,T.C. Memo. 1980-247. Petitioners contend that prior to the closing of the letter agreements, Askew and Nona Drilling advanced sums to the Venezuelan nationals and paid Askew's expenses in connection with the project in an amount totaling $1,262,685. Further, they claim that they disbursed from the $3,000,000 payment to NOARK a total amount of $2,901,691, reimbursing $1,065,000 to Alta Mar, Nona Drilling's successor, for amounts previously expended, and paying $1,836,691 to the Venezuelan nationals under Askew's contract with *581 Mrs. Rivero and Flores. Petitioners claim that, rather than having benefited from any portion of the $3,000,000, Alta Mar, Nona Drilling's successor, stood in a loss position with respect to the funds previously advanced by Nona Drilling. [12]
*582 In support of their claimed payments, petitioners presented only Askew's testimony and certain summary schedules detailing, on a check-by-check basis, expenditures from the Nona Drilling and NOARK accounts with comments concerning the purposes for which the expenditures were made. We are unable to accept and adopt these summary exhibits as credible evidence that all of the expenditures were made for the purposes claimed. These summary schedules as such have no actual probative value. They are not business records of either Nona Drilling or NOARK; they were not prepared contemporaneously with the events at issue. Rather, they are merely a summary of checks written on the Nona Drilling and NOARK accounts with comments as to the purposes of the checks prepared by Askew, his attorney, and Luis de Leon, his former bookkeeper in preparation for trial some 15 years after the fact. When questioned about various items in the exhibits, Askew had no recall concerning the purpose of any of the expenditures. [13] Askew's vague testimony and the summary exhibits containing unsupported and uncorroborated comments intended to flesh out the vague testimony, in our view, fall short of carrying *583 entirely petitioners' burden of proof. Based on our findings, we conclude that Nona Drilling advanced sums to the Venezuelan nationals and paid Askew's expenses in an amount totaling $1,282,000 which Askew was required to and did reimburse to Nona Drilling and its successor, Alta Mar. Further, we conclude that, from the $3,000,000 payment to NOARK, Askew paid an amount totaling $724,200 to the Venezuelan nationals in fulfillment of hs contract obligation with Mrs. Rivero and Flores, and he reimbursed $15,000 to himself for amounts he had advanced to Mrs. Rivero from his own funds. Askew was thus a conduit for funds or paid deductible expenses totaling $2,021,200. Petitioners' proof is insufficient to demonstrate that they are not taxable on the remaining $978,800 from the $3,000,000 payment received by NOARK. [14]
*584 As to petitioners' contention that all amounts paid out of the NOARK account constitute deductible business expenses under section 162(a), we find their proof on this issue also insufficient to support a conclusion that any more than $2,021,200 was actually expended under Askew's obligations in connection with the project. The major portion of the balance of funds paid out of the NOARK account consists of two payments totaling $816,000 made in 1971 to two Swiss bank accounts, the ownership of which was not established by any credible evidence by either party, [15] and three payments totaling $54,000 made to Jose Luis Brandt and Gustavo Conde in 1974. Petitioners have simply not convinced us that the payments made to the two Swiss Bank accounts and to Brandt and Conde were made in connection with Askew's obligations under the service contract project. *585 2. Interest Income
On September 1, 1971, Askew deposited $1,000,000 from the $3,000,000 payment to NOARK in a time deposit account for 33 days at 9-percent interest. On October 4, 1971, Askew redeposited the $1,000,000 plus $8,136.99 interest earned into the NOARK checking account. Respondent determined that interest income in the amount of $7,766, i.e., interest of $8,136 minus bank charges of $470, is taxable to petitioners. On brief petitioners concede that if we conclude that the $3,000,000 payment constitutes their taxable income, they are taxable as well on the interest income. Because we have concluded above that petitioners must include in gross income at least $978,800 of the payment from Occidental, we likewise conclude that they are taxable for 1971 on the interest earned on that income as well. 3. Additions to Tax
In the notice of deficiency, respondent determined an addition to tax for fraud under section 6653(b) with the alternative position that if it is determined that the section 6653(b) addition is inapplicable, then the addition to tax for negligence under section 6653(a) is applicable. In his answer, respondent conceded that the addition for *586 fraud under section 6653(b) is inapplicable. Petitioners contend that the issue of negligence is not properly before us because "the issue of the negligence penalty fell with the admission that respondent erred with respect to the 50 percent of tax fraud penalty"; that respondent should have affirmatively alleged the addition for negligence in his answer; and that they have been prejudiced by respondent's failure to plead the issue of negligence. We do not agree. Respondent made an explicit determination of the addition for negligence in the notice of deficiency. The fact that such determination was made as an alternative to the addition for fraud does not in any way detract from the fact that petitioners were apprised of the determination in the notice of deficiency. Although respondent, in his answer, abandoned his claim as to the addition for fraud, he in no way indicated an intention to abandon the alternative determination of negligence. We do not see how petitioners can have been prejudiced when such determination was made in the notice of deficiency, which is the foundation for the issues in a Tax Court case. [16] Petitioners' claim that the issue of negligence was raised *587 for the first time by respondent on brief is refuted by the plain fact that the determination appears on the face of the notice of deficiency. The issue, therefore, is properly before us. As to the merits of the issue, petitioners have the burden of proof to show that the underpayments in taxes determined above were not the result of their negligence or intentional *588 disregard of the rules and regulations. Enoch v. Commissioner,57 T.C. 781, 802 (1972); Foster v. Commissioner,80 T.C. 34, 237 (1983). In this regard, petitioners directed virtually no testimony to the question of negligence other than Askew's statements that he has never prepared a tax return and is not knowledgeable about taxes. On brief petitioners claim only that they "relied upon the advise [sic] of E. J. Ball, Attorney at Law, and J. W. Gould, Certified Public Accountant, when their 1971 and 1972 income tax returns were filed without including the $250,000.00 and the $3,000,000.00 finder's fees in those returns." This is insufficient, in our view, to show that their underpayments of tax for both 1970 and 1971 were not caused by negligence or intentional disregard of the rules and regulations. Petitioners' utter failure to keep or produce adequate records of these transactions, involving millions of dollars, is evidence enough of their neglect or disregard of rules they should have known they were required to follow. Contrary to how he would have us view him, we think Askew is an astute businessman who has been involved for years in *589 various and sophisticated business deals. He should have known that his records were inadequate. The inadequacy of the records in this case only leads us to conclude that petitioners were negligent. Askew did not indicate whether or not he sought legal advice concerning the tax treatment of the $250,000 payment in 1970, or whether he disclosed such payment to his attorney or accountant. He claims that he sought advice from his attorney with respect to the handling of the $3,000,000 payment to NOARK in 1971; however, as we view the record, we can only conclude that Askew went to some lengths to conceal its receipt and disbursal. He directed the law partner of his attorney to form NOARK, a foreign corporation, specifically to receive the payment. He failed to provide any information on his 1971 return that he had any interest in the NOARK account, although he did provide in the same return information on two other foreign corporations in which he had an interest. Only on his 1972 return did he indicate his interest in the NOARK account, after most of the $3,000,000 had been disbursed. The foregoing facts, combined the Askew's failure affirmatively to convince us otherwise, *590 compel us to sustain as warranted respondent's determination of the addition to tax under section 6653(a) for 1970 and 1971. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rules references are to the Tax Court Rules of Practice and Procedure unless otherwise noted. ↩
2. Resolution of the income issues set forth above (Issues 1 and 2) will determine whether and to what extent amounts claimed by petitioners as charitable contribution deductions for 1970, 1971, and 1972 must be adjusted. ↩
3. In the notice of deficiency, respondent determined an addition to tax for fraud under sec. 6653(b), with the alternative position that if it is determined that the sec. 6653(b) addition is inapplicable, then the addition to tax for negligence under sec. 6653(a) is applicable. In his answer, respondent conceded that the sec. 6653(b) addition is inapplicable.↩
4. This letter of June 29, 1968, uses the term "concessions" rather than "service contracts." Such letter was amended by letter agreement dated Sept. 2, 1968, in which the parties agreed that the term "service contracts" should be substituted for the term "concessions."↩
5. In another letter bated June 29, 1968, Occidental informed Askew that its first choice was that designated as block "E" and its last choice was that designated block "A."↩
6. At trial, petitioners presented several letters purportedly written by Rivero to Hammer concerning the service contracts. By stipulation of the parties, the letters were admitted in evidence for the limited purpose of demonstrating contact between the parties named in the letters; the substance of the letters was treated as inadmissible hearsay.↩
7. Askew was not able to provide an explanation concerning why Mrs. Rivero entered into the agreement rather than her husband, Rivero, with whom Askew had been dealing, other than that Rivero was a "sick man" at the time.↩
8. When CVP first announced its intention to receive bids for the five blocks in the South Lake Maracaibo region, 22 different oil companies expressed an interest in bidding for service contracts. Only four companies actually got into the competitive bidding stage, Occidental, Texaco, Shell, and Mobil.↩
9. Occidental Petroleum Corporation of Los Angeles, through various subsidiaries, owned 100 percent of the shares of Occidental de Venezuela, Inc., a Delaware corporation, and Occidental Worldwide Investment Corporation. Occidental Worldwide Investment Corporation owned 100 percent of the shares of Occidental Petroleum de Venezuela, S.A., a Venezuelan corporation.↩
10. Respondent does not content that the fair market value of this royalty interest is taxable to petitioners. See 4 Mertens, Law of Federal Income Taxation, sec. 24.23a p. 110 (1980 rev.).↩
11. There is no evidence, other than petitioners' statements on brief and one isolated statement made in a letter from Rivero to Askew, the substance of which was ruled inadmissible at trial, to show that Rivero and Flores were involved with Askew in the nickel deposit project, or that either Jose Maria de Castro Acosta or Israel Osorio Acosta were associated with Rivero or Flores. Thus, we consider petitioners' agency arguments with respect to the $250,000 payment to be unfounded. See discussion of the agency issue, infra,↩ in connection with the $3,00,000 payment in 1971.
12. Although there was some suggestion at the trial that Askew and his associates used these funds to bribe Venezuelan government officials, the trial record does not show that this is true. Our conclusion in this respect accords with a statement, as follows in Askew v. United States,680 F.2d 1206, 1208 (8th Cir. 1982), which involved a suit by Askew for damages under 5 U.S.C. sec. 552a (1982 ed.) for alleged unlawful disclosure of tax records: In October 1975, both the judicial and legislative branches of the Venezuelan government began investigations into Ryan's charges of bribery. By February 1976, Akew had appeared once before the judicial investigating body and three times before the Bicameral Commission set up by the Venezuelan legislature. A climax, of sorts, was reached on February 15, 1976, when the President of Venezuela appeared in national television and announced that he had been conducting his own investigation and that he knew the names of the people who had accepted the bribes. The president also displayed a photocopy of a check for $106,400 that Askew had written on the Noark account to Alberto E. Flores T, dated September 6, 1971. But for the display of this check, no names were announced by the president during his televised address; over the following days, however, the names of payees appeared in various Venezuelan newspapers. These names corresponded to the payees of some of the checks Askew and written on the Noark account and had turned over to the IRS. Askew was later incarcerated in Venezuela by a criminal court which held him pending the outcome of its investigation. Initially he was charged with bribery; later the charge was changed to conspiracy; and finally, after having spent four months in jail (July 19, 1976 to November 16, 1976), he was released when the charge was dismissed. Both the criminal court and the Bicameral Commission concluded that although money had definitely changed hands, none of the recipients was a government official. Neither investigation was able to uncover any evidence that undue influence had been brought to bear on the negotiations between Occidental and the government. [Fn. refs. omitted.]↩
13. Askew testified at trial that his memory had been temporarily impaired due to bypass surgery which he had undergone at some time before trial. While we sympathize with Askew's health problems, they do not alter the fact that petitioners have the burden of proof on this issue.↩
14. Our conclusion, based on the record before us, is not inconsistent with the following factual statement in Askew v. United States,supra at 1207: In the late 1960's Askew determined to use the many contacts he had developed in Venezuela and assumed the role of a promoter. He and his attorney negotiated a series of letter agreements with Dr. Armand Hammer, president of Occidental Petroleum Co., under which Askew would attempt to secure on behalf of Occidental service contracts granting oil and gas exploitation rights to certain areas of Venezuela's Lake Maracaibo. Askew was successful in securing these rights for Occidental in 1971. The relevant aspect of this arrangement to this litigation is Askew's subsequent receipt of $3 million from Occidental, most of which he then distributed in September and October 1971 to various influential Venezuelans who had been instrumental in Askew's success in obtaining the service contracts. * * *↩
15. Concerning the two payments to the Swiss bank accounts, Askew testified that he was directed to send these payments by Mrs. Rivero and her attorney. Askew's testimony is unconvincing absent some corroborating evidence. Respondent offered in evidence two reports issued by the Venezuelan government, a report of a special Bicameral Commission appointed to investigate the Occidental service contract deal and a report entitled "Report of Presumed Irregularities in the Granting of Service Contracts to Occidental Petroleum Company de Venezuela", both of which state that Alta Mar was the ultimate recipient of the funds paid to the two Swiss accounts. We do not base our conclusion with respect to the two accounts on these reports because we consider them hearsay.↩
16. See Mississippi Steel Corp. v. Commissioner,T.C. Memo. 1971-18, cited by petitioners, in which it was stated: In Federal income tax cases filed in this Court, the notice of deficiency is the foundation for issues * * *. * * * [W]ithout the notice of deficiency it would be impossible for this Court to redetermine the correctness of the deficiencies determined by the Commissioner. Hence, it is clear that when a copy of the notice of deficiency is attached to the petition, * * * the notice of deficiency and any statement attached thereto becomes a part of the pleadings and/or record in a Tax Court case. * * *↩